**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**RHONDA ANNETTE MCCLANAHAN,**

     **Plaintiff,**

**v.**                                      **Case No.: 3:14-cv-11819**

**CAROLYN W. COLVIN,**
**Acting Commissioner of**
**Social Security,**

     **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's brief requesting judgment on the pleadings and the Commissioner's brief in support of her decision requesting judgment in her favor. (ECF Nos. 13 & 14).

The undersigned has fully considered the evidence and the arguments of counsel.

1

For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED;** that the Commissioner's request for judgment on the pleadings be **GRANTED;** that the decision of the Commissioner be **AFFIRMED;** and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.    Procedural History

On April 15, 2011 and April 18, 2011, Plaintiff Rhonda Annette McClanahan ("Claimant"), filed applications for DIB and SSI, respectively, alleging a disability onset date of June 15, 2004, (Tr. at 432, 434), due to "COPD [chronic obstructive pulmonary disease], anxiety, heart condition, ptsd [post-traumatic stress disorder], neuropathy in legs, diabetes, thyroid problems, high blood pressure, cholesterol, psoriasis, sores under arms." (Tr. at 462). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 360, 365, 375, 378). Claimant filed a request for an administrative hearing, (Tr. at 381), which was held on September 11, 2012 before the Honorable LaRonna Harris, Administrative Law Judge ("ALJ"). (Tr. at 312-43). By written decision dated September 27, 2012, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 291-303). The ALJ's decision became the final decision of the Commissioner on January 9, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 9 & 10). Claimant then filed a Memorandum of Law in Support of Judgment on the Pleadings, (ECF No. 13), and the Commissioner subsequently filed a Brief in

Support of Defendant's Decision, (ECF No. 14). Consequently, the matter is fully briefed and ready for resolution.

## II.   <u>Claimant's Background</u>

Claimant was 43 years old at the time that she filed the instant applications for benefits, and 44 years old on the date of the ALJ's decision. (Tr. at 303, 432, 434). She has a GED and communicates in English. (Tr. at 461, 463). Claimant has previously worked as a case aide at a youth shelter, a cashier at a convenience store, a home health aide, and a telemarketer. (Tr. at 451-55).

## III.   <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry

is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results

to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents her findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

5

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through September 30, 2010. (Tr. at 293, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since June 15, 2004, the alleged disability onset date. (Tr. at 293, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "coronary artery disease; diabetes; peripheral neuropathy; anxiety; and depression." (Tr. at 293, Finding No. 3).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 293-296, Finding No. 4). Accordingly, she determined that Claimant possessed:

> [T]he residual functional capacity to perform a range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant is able to stand and walk for a total of about six hours of an eight-hour shift and sit for a total of about six hours of an eight-hour shift. She is able to climb ramps, stairs occasionally. She cannot climb ladders, ropes, or scaffolds. The claimant is able to balance, stoop, kneel, crouch, or crawl occasionally. She must avoid concentrated exposure to extreme cold, extreme heat, fumes, odors, dusts, gases, and poor ventilation. Further, the Claimant must avoid even moderate exposure to hazards such as machinery and heights. Finally, the Claimant is limited to work that involves minimal contact with supervisors or co-workers and is limited to work that does not involve calculating, problem solving, or reasoning.

(Tr. at 296-301, Finding No. 5). At the fourth step, the ALJ determined that Claimant was capable of performing past relevant work as a cashier based on the testimony of a vocational expert at the administrative hearing. (Tr. at 301-302, Finding No. 6). Nevertheless, as an alternative to the step-four finding, the ALJ proceeded to the fifth and final inquiry, and reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful

activity. (Tr. at 301-02). The ALJ considered that (1) Claimant was born in 1967, and was defined as a younger individual age 18-49; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because using the Medical-Vocational Rules as a framework supported a finding that the Claimant was "not disabled," whether or not the Claimant had transferable job skills. (Tr. at 301). Given these factors, Claimant's RFC, and the testimony of the vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy, including work as a hand packager or hotel maid at the light exertional level, and as an inspector or sorter at the sedentary exertional level. (Tr. at 302). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act, and thus was not entitled to benefits. (Tr. at 302-03, Finding No. 7).

## IV.    <u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant's challenges to the Commissioner's decision relate to the ALJ's analysis of opinions provided by Claimant's treating physician, Debra Stultz, M.D. (ECF No. 13 at 6-10). Claimant asserts that the ALJ ignored Dr. Stultz's treatment records and her opinions as to Claimant's mental limitations, and instead, assigned greater weight to the opinions of a consultative examiner, Penny Perdue, M.A. (*Id.* at 7-8). Claimant specifically points to Dr. Stultz's determination that Claimant's abilities were "poor" when it came to dealing with the public, interacting with supervisors, dealing with work stresses, understanding complex instructions, remembering complex instructions, carrying out complex instructions, behaving in an emotionally stable manner, and demonstrating reliability. (*Id.* at 8-9). Claimant contends that Dr. Stultz's opinions support a finding that she meets Listings 12.04 and 12.06. (ECF No. 13 at 3, 8-9). In

addition, Claimant argues that the hypothetical questions posed to the vocational expert were incomplete because they failed to include the mental limitations found by Dr. Stultz. (*Id.* at 10). Furthermore, Claimant maintains that the ALJ should have, at a minimum, requested that a medical expert testify at the administrative hearing, and by not doing so, the ALJ acted as a medical expert, which prejudiced Claimant because her counsel did not have the opportunity to cross-examine the ALJ as to her psychiatric conclusions. (*Id.* at 3-4, 10). Finally, Claimant argues that even if she is not considered disabled by virtue of her mental health condition alone, then the combination of her mental and physical ailments meets or equals a listing; although, Claimant does not specify which listing she meets. (*Id.* at 10).

In response, the Commissioner contends that the ALJ appropriately weighed Dr. Stultz's opinions. (ECF No. 14 at 8). The Commissioner insists that term "poor" used by Dr. Stultz in rating Claimant's abilities is not synonymous with the term "marked" as used by Listings 12.04 and 12.06. (ECF No. 14 at 8). Moreover, the Commissioner claims that Dr. Stultz's opinions were inconsistent with substantial evidence in the record, including the opinions of examining and non-examining medical consultants. (*Id.* at 8-9). Additionally, the Commissioner asserts that the ALJ accounted for Dr. Stultz's opinions in her RFC finding. (*Id.* at 9). With regard to the ALJ's questioning of the vocational expert at the administrative hearing, the Commissioner asserts that the ALJ's hypothetical questions were supported by substantial evidence, and she points out that the ALJ need not include all alleged limitations in a hypothetical question posed to an expert, only those supported by the record. (*Id.* at 10). The Commissioner also insists that substantial evidence supports the ALJ's finding that Claimant does not meet Listings 12.04 and 12.06, given Claimant's reports of her own activities and the opinions

of the state agency medical consultants. (ECF No. 14 at 12-13). Finally, the Commissioner argues that the ALJ appropriately exercised her discretion in refraining from calling a medical expert at the administrative hearing because the medical evidence was not complex, the record contained sufficient evidence for the ALJ to determine the severity of Claimant's mental impairments, and the opinions of two state agency physicians were already in the record. (*Id.* at 13-14).

## V.      Relevant Medical Evidence

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The relevant medical information is summarized as follows.

### A. Treatment Records from Stultz Sleep and Behavioral Health

On July 29, 2011, Claimant presented to Stultz Sleep and Behavioral Health with complaints of constant worry and anxiety. (Tr. at 1035). Claimant believed her recent heart bypass surgery was the cause of her increased anxiety. (*Id.*) Debra Stultz, M.D., recorded that Claimant was under the care of Dr. Diaz for fourteen years prior to her examination of Claimant.[1] (*Id.*) Dr. Stultz also indicated that Claimant's current medications included Celexa, Neurontin, Xanax, Wellbutrin, and Paxil. (*Id.*) Claimant reported decreased sleep, appetite, energy, motivation, and memory. (Tr. at 1036). Claimant also reported experiencing mood swings, elevated mood with panic and anxiety, tearfulness, nausea, hot flashes, panic, increased heart rate from fear, dry mouth, hot flashes, and chest pain. (*Id.*) Claimant further indicated that she experienced nocturia and restless legs. (*Id.*) She informed Dr. Stultz that she avoided social

---

[1] While the signature contained on the treatment records from Stultz Sleep and Behavioral Health is nearly illegible, it appears to be the signature of Dr. Stultz.

situations. (*Id.*) Upon examination, Claimant was alert and oriented. (Tr. at 1038). Dr. Stultz recorded that Claimant's mood was anxious. (*Id.*) Claimant denied experiencing suicidal and homicidal ideation or hallucinations. (*Id.*) Dr. Stultz diagnosed Claimant with major depressive episodes, severe; rule out bipolar disorder; obsessive compulsive disorder; generalized anxiety disorder; panic disorder; and rule out obstructive sleep apnea. (*Id.*) Claimant's treatment plan included a medication regimen of Celexa, Luvox, Ambien, Xanax, and Neurontin. (*Id.*) In addition, Claimant stated that she would consider undergoing a polysomnography to aid the diagnosis of her sleep issues. (*Id.*)

Claimant returned to Stultz Sleep and Behavioral Health on September 19, 2011. (Tr. at 1064). Claimant reported an increase in crying episodes and informed Dr. Stultz that her current stressor was money. (*Id.*) Claimant stated that she had not taken an antidepressant, but her anxiety attacks had decreased. (*Id.*) She also stated that her pharmacy would not fill the prescription for Luvox. (*Id.*) She continued to report experiencing obsessive worrying. (*Id.*) Claimant also indicated that she had been experiencing shoulder pain, which worried her because it made her afraid that she might be experiencing a heart attack. (*Id.*) Claimant informed Dr. Stultz that her husband had been having "rage" attacks, but that they had been trying to talk more. (*Id.*) Upon examination, Claimant was friendly with increased eye contact. (*Id.*) Dr. Stultz instructed Claimant to continue taking Ambien, Xanax, and Neurontin. (*Id.*)

Claimant next visited Dr. Stultz on October 21, 2011, for a follow-up and to discuss undergoing a polysomnography. (Tr. at 1065). Claimant informed Dr. Stultz that she was compliant with the prescribed medication. (*Id.*) However, she continued to experience insomnia. (*Id.*) Dr. Stultz noted Claimant was taking a diuretic that caused her to wake up periodically throughout the night. (*Id.*) Claimant expressed that she was

having increased grief issues over her mother's death, which occurred in 2009, but indicated that Luvox helped "a little." (*Id.*) Claimant's diagnosis remained the same. (*Id.*) Dr. Stultz switched Claimant from Ambien to Seroquel, and increased Claimant's Neurontin dosage. (*Id.*) Claimant was instructed to continue taking Xanax and Luvox as well. (*Id.*) Claimant informed Dr. Stultz that she was ready to undergo a polysomnography. (*Id.*)

On December 14, 2011, Claimant again treated with Dr. Stultz. (Tr. at 1191). Claimant reported that she had experienced "a couple of really bad panic attacks." (*Id.*) In addition, she complained of increased anxiety and fear of insomnia. (*Id.*) Claimant also indicated that she could not handle being around people like she used to and that she felt easily overwhelmed. (*Id.*) Claimant reported that she had stopped taking Seroquel because it caused her face to swell and feel numb. (*Id.*) Dr. Stultz recorded that the mood swings experienced by Claimant were primarily situational. (*Id.*) Upon examination, Dr. Stultz observed that Claimant's mood was anxious and her affect was blunted with signs of irritability. (*Id.*) Dr. Stultz indicated that Claimant suffered from decreased sleep, decreased memory, and increased tearfulness. (*Id.*) Dr. Stultz diagnosed Claimant with major depressive episodes, severe; rule out bipolar disorder; generalized anxiety disorder; obsessive compulsive disorder; and panic disorder. (*Id.*) Claimant was advised to increase her exposure to sunlight and her activities. (*Id.*) Dr. Stultz prescribed Ambien CR and increased Claimant's Luvox dosage. (*Id.*) She also instructed Claimant to continue taking Xanax and Neurontin. (*Id.*)

Claimant next visited Dr. Stultz on March 14, 2012. (Tr. at 1190). Claimant stated that the prior month had been extremely stressful for her as a result of family issues. (*Id.*) Claimant reported feeling overwhelmed with worry for her children and

grandchildren. (*Id.*) She also indicated that she felt no one cared about her and that her family often yelled at her. (*Id.*) In addition, Claimant reported increased problems with her COPD as well as a respiratory infection. (*Id.*) Claimant told Dr. Stultz that she was "tired of being sad, nervous, and depressed." (*Id.*) Upon examination, Claimant's mood was nervous, her affect was blunted, and she was tearful. (*Id.*) Claimant complained of decreased sleep, energy, memory, and concentration. (*Id.*) She also reported experiencing racing thoughts and obsessive ruminating. (*Id.*) Claimant's diagnosis remained unchanged. (*Id.*) Dr. Stultz advised Claimant to continue with ongoing therapy. (*Id.*) Dr. Stultz again increased Claimant's Luvox dosage and prescribed Risperdal. (*Id.*) Dr. Stultz recommended that Claimant continue taking Ambien CR, Neurontin, Xanax, Vitamin D3, and multivitamins as well. (*Id.*)

Claimant returned to Dr. Stultz on May 2, 2012 to discuss the results of her polysomnography. (Tr. at 1266). Dr. Stultz noted that Claimant would need to return for a CPAP titration test, and Claimant reported that she was "happy to fix [her] sleep problem." (*Id.*) Claimant informed Dr. Stultz that she was doing well on her medications, although she had developed an itchy rash on her arms, which she initially believed was caused by taking Risperdal, but later came to the conclusion that Risperdal was not the cause. (*Id.*) Claimant reported feeling stressed, anxious, and overwhelmed, but denied experiencing any panic attacks. (*Id.*) She further indicated that she was experiencing family issues. (*Id.*) In addition, she stated that she constantly worried and that she experienced crying spells. (*Id.*) Claimant described her mood as "a little better"; however, Claimant asserted that her "nerves" were not improved. (*Id.*) Upon examination, Dr. Stultz observed that Claimant's affect was constricted to blunt. (*Id.*) Dr. Stultz recorded that Claimant reported decreased sleep, appetite, motivation, and

memory along with increased tearfulness. (*Id.*) Claimant's diagnosis remained the same, and Dr. Stultz recommended that Claimant continue all of her medications with the exception of Risperdal. (Tr. at 1266-67). Dr. Stultz also prescribed Abilify. (Tr. at 1267). Claimant was advised to continue therapy and to set limits with her family members. (*Id.*)

The following month, on June 25, 2012, Claimant returned to Stultz Sleep and Behavioral Health with reports of coughing and difficulty breathing at night. (Tr. at 1265). The treater recorded that Claimant's home was the biggest concern as it was an older home that contained lead-based paint and asbestos. (*Id.*) Prescriptions for Luvox and Abilify were renewed. (*Id.*) On July 10, 2012, Claimant called Dr. Stultz to report that Abilify was causing an increase in her blood sugar level. (Tr. at 1537). Dr. Stultz instructed Claimant that she should no longer take Abilify. (*Id.*)

On September 24, 2012, Claimant again treated with Dr. Stultz. (Tr. at 1534). Claimant stated that her panic attacks had increased and that she was unable to use her CPAP machine due to the poor air quality in her home. (*Id.*) She also informed Dr. Stultz that her diabetes had gotten worse. (*Id.*) Dr. Stultz observed that Claimant was alert, oriented, and cooperative. (*Id.*) In terms of her mood, Claimant stated that she had been better. (*Id.*) Claimant was diagnosed with obstructive sleep apnea, generalized anxiety disorder, depression, and panic disorder. (Tr. at 1535). Dr. Stultz discussed with Claimant the topics of medical use and compliance, CPAP use, and relaxation therapy. (*Id.*) Claimant was also provided cognitive and behavioral counseling as well as weight and nutritional counseling. (*Id.*) Claimant was instructed to continue taking Luvox, Xanax, Neurontin, and Ambien CR. (*Id.*) Dr. Stultz temporarily increased Claimant's Xanax dosage. (*Id.*)

13

### B. Evaluations and Opinions

On June 21, 2011, Claimant underwent a psychological evaluation by Penny Perdue, M.A., Licensed Psychologist. (Tr. at 1009-11). Ms. Perdue noted that Claimant's grooming and hygiene were adequate, and she was cooperative throughout the examination. (Tr. at 1009). Claimant reported that she was severely depressed and that her depression began fourteen years prior to the evaluation. (*Id.*) She also indicated that she cried and worried "all the time," and that she was not motivated to work. (*Id.*) She further reported that she experienced a loss of interest in things, poor appetite, difficulty sleeping, loss of energy, feelings of worthlessness, increased nervousness, and increased worrying. (*Id.*) Claimant informed Ms. Perdue that she had previously worked as a cashier at a convenience store where she was twice robbed at gunpoint in one week. (*Id.*) She indicated that she had previously received counseling from a doctor for fourteen years due to her depression and anxiety. (Tr. at 1010). At the time of the evaluation, Claimant was not attending counseling. (*Id.*) Claimant reported no past psychiatric hospitalizations. (*Id.*) Claimant stated that she was taking Celexa, Neurontin, and Xanax, among other medications for her physical conditions. (*Id.*) Claimant informed Ms. Perdue that her typical day included spending time doing light cleaning, watching television, and sitting at home. (Tr. at 1011). Claimant reported that she had the ability to prepare sandwiches or cereal, read, care for her personal grooming and hygiene, and handle the finances with her husband. (*Id.*) She stated that she could no longer cook, travel, go shopping, or go camping. (*Id.*) She also relayed that she needed her husband's help with cleaning and her daughters' help with doing laundry. (*Id.*) Upon mental status examination, Ms. Perdue observed that Claimant's eye contact and verbal responses were adequate, and that Claimant interacted with her in an appropriate fashion. (Tr. at

1010). Ms. Perdue recorded that Claimant's speech was relevant and coherent, she was oriented times four, her mood was depressed and anxious, her affect was restricted with occasional tearfulness, her thought process was normal, her thought content was normal, and her insight was fair. (Tr. at 1010-11). Ms. Perdue further indicated that Claimant's judgment appeared moderately deficient based on her responses to simple comprehension questions. (Tr. at 1011). Ms. Perdue found that Claimant's immediate memory was mildly limited, her recent memory was moderately deficient, and her remote memory was mildly deficient. (*Id.*) Claimant's concentration was observed to be mildly deficient given her digit span test score of seven. (*Id.*) As for Claimant's social functioning, Ms. Perdue recorded that Claimant's interaction with her was within normal limits during the examination. (*Id.*) Claimant informed Ms. Perdue that she did not have any social activities other than visiting with friends or family who stopped by to see her. (*Id.*) Claimant also indicated that she got along with other people. (*Id.*) As for Claimant's persistence and pace, Ms. Perdue found that they were both within normal limits. (*Id.*) Ms. Perdue diagnosed Claimant with major depressive disorder, single episode, unspecified. (*Id.*) She opined that Claimant's prognosis was poor. (*Id.*)

On July 1, 2011, G. David Allen, Ph.D., completed a Psychiatric Review Technique. (Tr. at 1012-1025). Dr. Allen found that a Residual Functional Capacity Assessment was necessary. (Tr. at 1012). Dr. Allen opined that Claimant suffered from an affective disorder, specifically a depressive syndrome with accompanying symptoms of anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, decreased energy, feelings of guilt and worthlessness, and difficulty concentrating or thinking. (Tr. at 1015). As to Claimant's functional limitations, Dr. Allen found that Claimant had no limitations with regard to activities of daily living and no episodes of

decompensation of extended duration. (Tr. at 1022). However, Dr. Allen concluded that Claimant was mildly limited in maintaining social functioning as well as maintaining concentration, persistence, and pace. (*Id.*) Dr. Allen determined that the evidence did not establish the presence of paragraph C criteria. (Tr. at 1023). In the consultative notes section of the Psychiatric Review Technique form, Dr. Allen recorded that Claimant had alleged that she suffered from anxiety and post-traumatic stress disorder. (Tr. at 1024). He observed that Claimant reported receiving outpatient treatment from 1997 to 2011 at Huntington Behavioral Health, but that he had not received any records for Claimant's treatment there. (*Id.*) In addition, Dr. Allen summarized Ms. Perdue's evaluation of Claimant. (*Id.*) He further noted that Claimant's activities of daily living included washing dishes; doing chores; going out alone, although she preferred to not be alone; shopping once every two weeks; talking on the telephone; attending church; watching television; and reading. (*Id.*) Dr. Allen acknowledged that Claimant had reported anxiety and panic attacks when around a lot of people. (*Id.*) Claimant had also indicated that she did not need reminders for grooming, but needed a reminder to take her medication in the evening. (*Id.*) Dr. Allen further recognized that Claimant reported that she was confused by bank accounts and that she had problems with memory, concentration, getting along with other people, changes in routine, and understanding and following directions. (*Id.*) Claimant also reported that stress caused her to cry and have anxiety attacks. (*Id.*) Dr. Allen found that there was insufficient evidence for Claimant's date of last insured period. (*Id.*) As for Dr. Allen's current evaluation, he ultimately opined that Claimant's key functional capacities were within normal limits and that Claimant was only partially credible. (*Id.*)

On August 30, 2011, Jeff Boggess, Ph.D., completed a Psychiatric Review Technique. (Tr. at 1047-60). Dr. Boggess opined that Claimant's impairments were not severe. (Tr. at 1047). He found that Claimant suffered from major depressive disorder and generalized anxiety disorder. (Tr. at 1050, 1052). As to Claimant's functional limitations, Dr. Boggess determined that Claimant was mildly limited in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. (Tr. at 1057). Dr. Boggess recorded that Claimant had not experienced any episodes of decompensation of extended duration. (*Id.*) Additionally, Dr. Boggess determined that the evidence did not establish the presence of paragraph C criteria. (Tr. at 1058). Dr. Boggess noted that Claimant alleged suffering from anxiety and post-traumatic stress disorder. (Tr. at 1059). Dr. Boggess indicated that Claimant's date last insured was September 30, 2010, and concluded that there was insufficient evidence related to the period prior to that date. (*Id.*) As for Dr. Boggess's present determination, he found that Claimant's impairments were non-severe. (*Id.*) In support of his finding, Dr. Boggess cited Ms. Perdue's evaluation of Claimant and a July 2011 treatment record from Dr. Stultz. (*Id.*) He recognized that Claimant reported treating at Huntington Behavioral Health, but that no treatment records from there were in the file. (*Id.*) As for the treatment record from Dr. Stultz, Dr. Boggess indicated that the record listed several psychiatric diagnoses; however, it appeared to him that the diagnoses stemmed from Claimant's self-reports rather than diagnoses based upon examination. (*Id.*) Dr. Boggess further noted that the record did not contain a longitudinal history or current treatment that would support the listed psychiatric diagnoses. (*Id.*) He also observed that the qualifications of the person who created the record were unclear. (*Id.*) Accordingly, Dr. Boggess declined to assign controlling weight to the Stultz treatment record given that

17

the specialty area of the treatment provider and the nature of the evaluation was unclear from the record. (*Id.*) As to Claimant's credibility, Dr. Boggess observed that Claimant had alleged all possible functional limitations on her adult functional report, but that her self-reported activities of daily living did not support the alleged level of limitation. (*Id.*) Dr. Boggess also opined that Claimant's recent mental status examination did not support her allegations. (*Id.*) As such, Dr. Boggess found that Claimant was only partially credible. (*Id.*)

On December 14, 2011, Dr. Stultz prepared a Medical Assessment of Ability to do Work-Related Activities (Mental). (Tr. at 1113-15). Dr. Stultz was asked to rate Claimant's ability to perform work-related activities on a day-to-day basis using a scale that range from no ability to unlimited ability, with "poor," "fair," and "good" ability in between. (Tr. at 1113). "Poor" ability meant that ability to function was seriously limited but not precluded; "fair" ability meant that ability to function was limited but satisfactory; and "good" ability meant that ability to function in this area was more than satisfactory. (*Id.*) Dr. Stultz opined that Claimant's abilities to follow work rules and use judgment were good and that her abilities were fair when it came to relating to co-workers, functioning independently, maintaining attention and concentration, understanding detailed and simple instructions, remembering detailed and simple instructions, carrying out detailed and simple instructions, maintaining personal appearance, and relating predictably in social situations. (Tr. at 1113-14). However, Dr. Stultz found that Claimant's abilities were poor when it came to dealing with the public, interacting with supervisors, dealing with work stresses, understanding complex instructions, remembering complex instructions, carrying out complex instructions, behaving in an emotionally stable manner, and demonstrating reliability. (*Id.*) Dr. Stultz

attributed these limitations to Claimant's severe anxiety, panic attacks, and depression. (Tr. at 1115). She noted that Claimant had been prescribed a number of medications and that Claimant had multiple health problems. (*Id.*) Dr. Stultz opined that Claimant's severe anxiety limited her ability to interact with other people and that her concentration and memory were decreased as a result of her depression and anxiety. (*Id.*) Dr. Stultz indicated that the combination of Claimant's health and psychiatric problems would prevent her from maintaining a reliable work schedule. (*Id.*) Dr. Stultz did find that Claimant would be capable of managing any benefits received in her own best interest. (*Id.*)

## VI.  **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456). Moreover,

"[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.   Discussion

### A. The ALJ's Consideration of Dr. Stultz's Opinions

Claimant contends that the ALJ ignored treatment records from Dr. Stultz and disregarded her opinions as to Claimant's functional limitations. (ECF No. 13 at 7-8). She also argues that the ALJ erred by assigning greater weight to Ms. Perdue's opinion than was assigned to Dr. Stultz's opinion. (*Id.* at 8). If the ALJ had not rejected Dr. Stultz's opinions as to Claimant's limitations, Claimant maintains that she would have been found disabled under Listings 12.04 and 12.06. (*Id.* at 3, 8-9).

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). Title 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) outline how the opinions of accepted medical sources will be weighed in determining

whether a claimant qualifies for disability benefits. In general, an ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.* If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors[2] listed in 20 C.F.R. § 404.1527(c)(2)-(6) and 20 C.F.R. § 416.927(c)(2)-(6), and must explain the reasons for the weight given to the opinions.[3] "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ...

---

[2] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

[3] Although 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) provide that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* §§ 404.1527(c)(2), 416.927(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 (stating that when a decision is not fully favorable, "the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). This Court has held that "while the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W.Va. Sept. 30, 2014).

In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4. Nevertheless, a treating physician's opinion may be rejected in whole or in part when there is persuasive contrary evidence in the record. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner, however, are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183 (S.S.A. 1996). In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special

significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

As noted above, in a December 2011 form, Dr. Stultz opined that Claimant's abilities to follow work rules and use judgment were good and that her abilities were fair when it came to relating to co-workers, functioning independently, maintaining attention and concentration, understanding detailed and simple instructions, remembering detailed and simple instructions, carrying out detailed and simple instructions, maintaining personal appearance, and relating predictably in social situations. (Tr. at 1113-14). On the other hand, Dr. Stultz concluded that Claimant's abilities were poor when it came to dealing with the public, interacting with supervisors, dealing with work stresses, understanding complex instructions, remembering complex instructions, carrying out complex instructions, behaving in an emotionally stable manner, and demonstrating reliability. (*Id.*) Dr. Stultz attributed these limitations to Claimant's severe anxiety, panic attacks, and depression. (Tr. at 1115). She noted that Claimant had been prescribed numerous medications and that Claimant had multiple health problems. (*Id.*) Dr. Stultz asserted that Claimant's severe anxiety limited her ability to interact with other people and that her concentration and memory were decreased as a result of her depression and anxiety. (*Id.*) Dr. Stultz further opined that the combination of Claimant's health and psychiatric problems would prevent her from

maintaining a reliable work schedule. (*Id.*)

In her written decision, before addressing Dr. Stultz's opinions, the ALJ recognized that certain rules and regulations control the weighing of medical opinion evidence, including 20 C.F.R. § 404.1527, 20 C.F.R. § 416.927, and "SSRs 96-2p, 96-5p, 96-6p and 06-3p." (Tr. at 296). The ALJ also discussed Claimant's allegations, the testimony given at the administrative hearing, and Claimant's activities of daily living as reported at her evaluation with Ms. Perdue. (Tr. at 295-96). The ALJ then thoroughly summarized Claimant's treatment records, including medical records related to her treatment with Dr. Stultz from July 2011 through May 2012. (Tr. at 298-99). Next, the ALJ discussed Ms. Perdue's evaluation of Claimant and assigned "great weight" to Ms. Perdue's findings and conclusions. (Tr. at 299). Nonetheless, the ALJ found that Claimant was more limited in social functioning than Ms. Perdue had found. (*Id.*) As such, the ALJ included limitations for social functioning in her RFC determination. (*Id.*) The ALJ then summarized Dr. Stultz's opinions and assigned them "some weight." (Tr. at 299-30). The ALJ stressed that the definition of "poor" ability in Dr. Stultz's assessment form did *not* equate to being precluded from functioning in that area. (Tr. at 300). She concluded that "the objective evidence and the consultative examination" did not support a finding that Claimant was "mentally unable to perform all work." (*Id.*) Still, the ALJ recognized that Claimant had some limitations in social functioning and concentration, persistence, and pace, which she accounted for in her RFC determination by restricting Claimant to work that involves "minimal contact with supervisors or co-workers," and does not involve "calculating, problem solving, or reasoning." (*Id.*) Finally, the ALJ turned to the opinions of Dr. Allen and Dr. Boggess. (*Id.*) She assigned "little weight" to their opinions because the evidence demonstrated that Claimant

suffered from mental impairments "that caused more than minimal functional limitation in [her] ability to perform basic work activities." (*Id.*)

As the ALJ explained, she assigned only "some weight" to Dr. Stultz's opinions because they were inconsistent with the objective medical evidence as a whole and Ms. Perdue's evaluation of Claimant. (Tr. at 300). Included in the objective medical evidence relied upon by the ALJ was Dr. Stultz's medical file pertaining to Claimant. At the time that Dr. Stultz completed the December 2011 assessment form containing her opinions, Claimant had treated with Dr. Stultz only four times over a period of approximately five months. (Tr. at 1064-65, 1191-95). Quite simply, the ALJ found that Dr. Stultz's treatment records from July 2011 to December 2011 did not support her opinions as to the severity of Claimant's functional limitations. After initially reporting in July 2011 that she had feelings of worry, panic, and anxiety, and after receiving prescriptions for her symptoms, Claimant returned to Dr. Stultz in September 2011 stating that her anxiety had decreased. (Tr. at 1035-36, 1038, 1064). At that appointment, Claimant's demeanor was observed to be friendly. (Tr. at 1064). The following month, in October 2011, Claimant informed Dr. Stultz that Luvox had helped to relieve her symptoms, and her mental health complaints at that visit primarily related to grief issues and insomnia. (Tr. at 1065). At her December 2011 appointment with Dr. Stultz, which was her final visit before Dr. Stultz completed the assessment form, Claimant stated that she had experienced some panic attacks and that her anxiety had increased. (Tr. at 1191). She also reported feeling easily overwhelmed. (*Id.*) Nevertheless, Claimant's treatment plan remained conservative as Dr. Stultz increased Claimant's Luvox dosage, prescribed Ambien CR, and recommended that Claimant continue taking Xanax and Neurontin. (*Id.*) The medical records from the brief period of time that Claimant treated with Dr.

Stultz prior to December 2011 demonstrate that Claimant's symptoms tended to improve with conservative treatment. (*Id.*) Furthermore, while Dr. Stultz opined that Claimant's anxiety limited her ability to interact with others, none of Dr. Stultz's treatment records from July 2011 to December 2011 note that Claimant had any difficulty interacting with Dr. Stultz or her staff.

The ALJ emphasized that Claimant's limitations had to be assessed in the context of the "entire record." (Tr. at 300). Obviously, notes from four visits cannot provide the detailed, longitudinal picture of a claimant's impairment that underlies the "treating source rule" and justifies the concept of affording these opinions controlling weight. Without the foundation that sets a treating physician apart from the others, applying the treating source rule can be problematic, as is exemplified when reviewing the remainder of Dr. Stultz's treatment notes and the other records in evidence. While Claimant frequently complained to Dr. Stultz of feeling anxiety, panic, and worry, the record as a whole plainly shows that Claimant experienced these symptoms with fluctuating severity; particularly, as time passed and as Claimant's symptoms were treated. (Tr. at 1036, 1064, 1190-91, 1266, 1534). At some appointments, Claimant's mood was noted to be anxious and her affect was blunted. (Tr. at 1190-91, 1266). Still at other appointments, she was described as cooperative or friendly. (Tr. at 1064, 1534). Similarly, treatment records from different health care providers spanning June 2009 to April 2013, reflect that Claimant's mood and affect were often observed to be normal, appropriate, or good. (Tr. at 116, 179, 694, 722, 736, 842, 903, 1083). During the same time periods that Claimant would occasionally report feeling anxious or depressed, she would also deny those feelings. (Tr. at 158, 670, 783, 812, 996, 1144, 1216, 1241). Therefore, taken as a whole, the ALJ found the evidence to corroborate "some limitation

in social functioning and concentration, persistence, or pace," but it did not "support a finding that the claimant [was] mentally unable to perform all work." (Tr. at 300).

In addition to the inconsistencies between Dr. Stultz's opinions and the record as a whole, there were discrepancies within Dr. Stultz's opinions. She determined in her December 2011 assessment that Claimant's ability to relate to co-workers was "fair," which seems to undermine her opinion that Claimant's ability to interact with others was limited. (Tr. at 1113). In addition, although Dr. Stultz asserted that Claimant's concentration and memory were decreased as a result of her depression and anxiety, Dr. Stultz opined that Claimant still retained "fair" ability in the areas of understanding, remembering, and carrying out both simple and detailed instructions. (Tr. at 1114-15). Dr. Stultz further asserted that Claimant's ability to maintain attention and concentration was "fair." (Tr. at 1113). As for Dr. Stultz's opinions concerning Claimant's reliability, she also opined that Claimant's abilities to function independently, use judgment, and follow work rules were all "fair" or "good." (Tr. at 1113). Those abilities certainly have bearing on Claimant's reliability. Moreover, there is no evidence that Claimant was ever terminated from a job for being unreliable. To the contrary, Claimant's past position as a home health aide would seem to require reliability as well as a functional level of interpersonal skills.

Ms. Perdue's evaluation of Claimant also supports the weight assigned to Dr. Stultz's opinions by the ALJ. Ms. Perdue observed that Claimant was cooperative and interacted appropriately with adequate eye contact and verbal responses. (Tr. at 1010). Ms. Perdue noted that Claimant's social interaction at the examination was within normal limits. (Tr. at 1011). Claimant informed Ms. Perdue that she received family and friends as visitors and she got along with other people, but she also stated that she

stayed to herself and that she experienced anxiety around other people. (*Id.*) Ms. Perdue's observations and Claimant's statements tend to demonstrate that Claimant is not as socially functionally limited as Dr. Stultz determined. Moreover, while Claimant's mood at the examination was depressed and anxious, and her affect was restricted with occasional tearfulness, Ms. Perdue noted that Claimant's thought process, thought content, perception, and insight were all normal or fair. (Tr. at 1010-11). Ms. Perdue also recorded that Claimant was capable of "light cleaning," making cereal or sandwiches, and caring for her personal grooming and hygiene.[4] (Tr. at 1011). Claimant further indicated that her hobbies included watching television and reading. (*Id.*) Additionally, Ms. Perdue opined that Claimant's pace and persistence were within normal limits while her concentration was mildly deficient. (*Id.*) These findings tend to support Dr. Stultz's opinion that Claimant retains a fair ability to maintain concentration as well as understand, remember, and carry out detailed and simple job instructions. (Tr. at 1113-14). Given the record evidence, the ALJ appropriately assigned greater weight to the observations and opinions of Ms. Perdue than to those of Dr. Stultz. *See* SSR 96-6P, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating ... sources.").

Likewise, the opinions of Dr. Allen and Dr. Boggess bolster the ALJ's finding as to Dr. Stultz's opinions, even though she assigned each of their opinions "little weight." (Tr. at 300). Dr. Allen determined that Claimant experienced only mild limitations in the areas of social functioning and maintaining concentration, persistence, and pace.

---

[4] At the administrative hearing, Claimant testified that she prepared small meals for lunch and dinner. (Tr. at 322). She also stated that she went grocery shopping with her daughters, but just sat in a chair and picked out what she wanted. (Tr. at 323).

(Tr. at 1022). He also opined that Claimant possessed no limitation in her activities of daily living. (*Id.*) Similarly, Dr. Boggess opined that Claimant had nothing more than mild limitations in all three functional categories. (Tr. at 1057). Dr. Boggess's opinion was formed after reviewing Claimant's August 2011 treatment record with Dr. Stultz. (Tr. at 1059).

Finally, as the Commissioner points out, the ALJ accounted for many of the limitations found by Dr. Stultz when formulating Claimant's RFC. The ALJ addressed Dr. Stultz's opinions as to Claimant's social functioning by restricting Claimant to work that involved minimal contact with supervisors or co-workers. (Tr. at 296, 300). In addition, the ALJ acknowledged Dr. Stultz's opinions as to Claimant's limitations in maintaining concentration, persistence, and pace by limiting her to work that does not involve calculating, problem solving, or reasoning. (*Id.*) Any error in failing to assign greater weight to Dr. Stultz's opinions in these areas was harmless because the ALJ's RFC determination in these areas was consistent with Dr. Stultz's opinions. *See, e.g.*, *Love-Moore v. Colvin*, No. 7:12-CV-104-D, 2013 WL 5350870, at *2 (E.D.N.C. Sept. 24, 2013) (holding that ALJ's failure to *even consider* physician's opinion was harmless where ALJ's RFC determination was consistent with physician's opinion). To the extent that the ALJ failed to include any limitation concerning Dr. Stultz's opinion as to Claimant's reliability, there was no evidence in the record that Claimant's mental health issues would cause her to be unreliable. To the contrary, Claimant's Work History Report demonstrates that Claimant held jobs for a number of years at a time, and most recently, a job as a home health aide for ten months, which is a position that certainly requires reliability in work schedule. (Tr. at 451). Claimant reported to Ms. Perdue that she quit her job as a home health aide because she was unmotivated to work, and she

cried and worried "all [of] the time."[5] (Tr. at 1009).

In sum, the ALJ's finding that Dr. Stultz's opinions were entitled to "some weight" is supported by substantial evidence. Dr. Stultz's own treatment records belie her opinions as to the severity of Claimant's mental health limitations. Moreover, Dr. Stultz's opinions were formed after only four visits in a five-month span. In addition, as the ALJ noted, the opinions of Ms. Perdue, Dr. Allen, and Dr. Boggess all support the ALJ's determination that Dr. Stultz's opinions were entitled to only "some weight." To the extent that Dr. Stultz's opinions can be considered opinions on medical issues, and not Claimant's RFC, which is an issue reserved to the Commissioner, as the ALJ implicitly found, those opinions were not entitled to controlling weight because they were not supported by clinical and laboratory diagnostic techniques and they are inconsistent with other substantial evidence. Furthermore, as discussed above, there was persuasive contrary evidence in the record supporting the ALJ's partial rejection of Dr. Stultz's opinions. *See Coffman*, 829 F.2d at 517. Finally, the ALJ supplied "good reasons" for assigning only partial weight to Dr. Stultz's opinions by comparing her opinions to the objective medical evidence and Ms. Perdue's observations and opinions.

Therefore, the undersigned **FINDS** that the ALJ complied with the applicable Social Security regulations and rulings in weighing the medical source opinions, and she supplied good reasons, which are supported by substantial evidence, for assigning only "some weight" to Dr. Stultz's opinions.

---

[5] When asked at the administrative hearing about her last job, Claimant testified that she last worked as a clerk at a convenience store. (Tr. at 315). It is unclear why she did not report working as a home health aide from June 2009 to April 2010. (Tr. at 451). Nonetheless, the vocational expert did recognize that Claimant had reported previously worked as a home health aide. (Tr. at 335).

### B. Listings 12.04 and 12.06

As set forth above, Claimant asserts that Dr. Stultz's opinions, if assigned appropriate weight, would support a finding that Claimant meets Listings 12.04 and 12.06. While the undersigned has already determined that substantial evidence supports the ALJ's assignment of "some weight" to Dr. Stultz opinions, which tends to obviate any need for discussion of Claimant's position on this issue, the undersigned will nevertheless address Claimant's specific contention as to Listings 12.04 and 12.06.

A determination of disability may be made at step three of the sequential evaluation when a claimant's impairments meet or medically equal an impairment included in the Listing. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). The purpose of the Listing is to describe "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *Id.* §§ 404.1525, 416.925. Because the Listing is designed to identify those individuals whose medical impairments are so severe that they would likely be found disabled regardless of their vocational background, the SSA has intentionally set the medical criteria defining the listed impairments at a higher level of severity than that required to meet the statutory standard of disability. *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). Given that the Listing bestows an irrefutable presumption of disability, "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Id.* at 530.

To the extent that Claimant avers that she meets a listing other than Listings 12.04 and 12.06, her claim fails for lack of specificity. (ECF No. 13 at 10). Courts in this jurisdiction have repeatedly rejected arguments where a claimant "'does not even attempt to specify which listing she believes her conditions meet,'" because it is the

claimant's burden to prove that her condition meets or equals one of the listed impairments. *Thomas v. Astrue*, No. 3:09-00586, 2010 WL 4918808, at *8 (S.D.W.Va. Nov. 24, 2010) (quoting *Spaulding v. Astrue*, No. 2:09-cv-00962, 2010 WL 3731859, at *16 (S.D.W.Va. Sept. 14, 2010)); *see also Vance v. Astrue*, No. 2:11-cv-0781, 2013 WL 1136961, at *17 (S.D.W.Va. Mar. 18, 2013); *Berry v. Astrue*, No. 3:10-cv-00430, 2011 WL 2462704, at *9 (S.D.W.Va. June 17, 2011). The only listings cited in Claimant's brief are Listings 12.04 and 12.06, and the only arguments made by Claimant relate to the ALJ's findings concerning her mental limitations. Consequently, those listings are the only listings that merit any discussion here.

In order to meet or medically equal Listing 12.04 or 12.06, Claimant must first establish that she fulfills the criteria set forth in paragraph A of the disorders, often referred to as the diagnostic description. As explained in the Listing, "[t]he criteria in paragraph A substantiate medically the presence of a particular mental disorder. Specific symptoms, signs, and laboratory findings in the paragraph A criteria of any of the listings in this section cannot be considered in isolation from the description of the mental disorder contained at the beginning of each listing category. Impairments should be analyzed or reviewed under the mental category(ies) indicated by the medical findings." 20 C.F.R. § 404, Subpart P, App. 1, ¶ 12.00(A). Assuming that Claimant meets the paragraph A criteria for Listing 12.04 or 12.06, she must also meet or equal the severity criteria contained in paragraph B or paragraph C of the listed impairment in order to be presumptively disabled. *Id.* ("The criteria in paragraphs B and C describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity. The functional limitations in paragraphs B and C must be the result of the mental disorder described in the diagnostic description, that

is manifested by the medical findings in paragraph A"). Under Listings 12.04 and

12.06, Claimant must show that her affective disorder or anxiety disorder:

B. [Resulted] in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

**OR**

C. [She had a m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. § 404, Subpart P, App. 1, ¶¶ 12.04, 12.06. In relation to Listings 12.04 and

12.06, marked "means more than moderate but less than extreme." *Id.* ¶ 12.00(C). "A

marked limitation may arise when several activities or functions are impaired, or even

when only one is impaired, as long as the degree of limitation is such as to interfere

seriously with your ability to function independently, appropriately, effectively, and on a

sustained basis." *Id.*

In discussing the paragraph B criteria of Listings 12.04 and 12.06, the ALJ found that Claimant had mild restriction in activities of daily living and social functioning, and moderate restriction with regard to maintaining concentration, persistence, and pace. (Tr. at 295). Beginning with activities of daily living, the ALJ noted that Claimant reported to Ms. Perdue that she was able to perform light cleaning, cook light meals, care for her personal needs, watch television, and read as a hobby. (*Id.*) However, the ALJ also took into account that Claimant stated that she required help from her husband and daughters with cleaning, laundry, and shopping. (*Id.*) As to social functioning, the ALJ observed that Claimant reported no social activities other than visiting with friends and family who stopped by her home. (*Id.*) The ALJ noted that Claimant reported being anxious around people, but also stressed that Ms. Perdue opined that Claimant interacted normally throughout her evaluation of Claimant. (*Id.*) Finally, as to concentration, persistence, and pace, the ALJ remarked that Claimant had reported difficulty with her memory and that Ms. Perdue opined that Claimant's memory was mildly to moderately impaired. (*Id.*) Nonetheless, the ALJ recognized that Ms. Perdue also concluded that Claimant's persistence and pace were within normal limits and that Claimant's concentration was only mildly deficient. (*Id.*) Given these findings, the ALJ concluded that Claimant did not meet the paragraph B criteria of Listings 12.04 and 12.06.[6] (*Id.*) The ALJ also determined that the evidence failed to establish the presence of the paragraph C criteria. (*Id.*)

Claimant's argument related to Listings 12.04 and 12.06 fails because, as discussed above, substantial evidence supports the ALJ's findings as to Dr. Stultz's

---

[6] The ALJ also found that Claimant had not experienced any episodes of decompensation of extended duration. (Tr. at 295).

opinions. Stated differently, because Dr. Stultz's opinions form the entire basis for Claimant's Listing argument and some of those opinions are unsupported by the record, Claimant has failed to meet her burden in demonstrating that she meets the paragraph B or C criteria. Moreover, the ALJ thoroughly summarized the evidence that supported her paragraph B analysis and contravened Dr. Stultz's opinions. (Tr. at 295). While Claimant asserts that her emotional instability and unreliability would prevent her from maintaining social functioning, Claimant's ability in that area was not as limited as Dr. Stultz opined. The record did not demonstrate that Claimant had a history of altercations or firings, and she reported interacting with her family and friends. She also told Ms. Perdue that she got along with other people. Others described Claimant as cooperative, and while she reported that she preferred to keep to herself, she testified that she traveled to the store with her family to shop and stated that she received visitors. Additionally, as discussed above, there is no evidence that Claimant is an unreliable person, aside from Dr. Stultz's opinion. Furthermore, although Claimant argues that she will suffer episodes of decompensation if she is "unleashed upon the workplace," (ECF No. 13 at 10), there is no evidence to support this assertion. To the contrary, no episodes of decompensation are apparent from the record while Claimant was consistently working.

Lastly, as the Commissioner argues, the term "poor" as used by Dr. Stultz is not synonymous with the term "marked" as used in Listings 12.04 and 12.06. Other federal courts have agreed that terms similar to those used by Dr. Stultz, although defined using language resembling that contained in the Listings' explanation of "marked," are still not equivalent to "marked." *See Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 993-94 (6th Cir. 2007) (recognizing that use of term "fair," which was defined as

"seriously limited but not precluded," was not synonymous to marked); *cf. Colvin v. Barnhart*, 475 F.3d 727, 731 (6th Cir. 2007) ("The plain meaning of 'seriously limited but not precluded' is that one is not precluded from performing in that area. It defies logic to assert that a finding of 'not precluded' actually means that one is precluded."); *Lehnartz v. Barnhart*, 142 F. App'x 939, 942 (8th Cir. 2005) (noting that *numerous* ratings of "seriously limited, but not precluded" on work activities form *may* indicate "marked" impairment); *Cantrell v. Apfel*, 231 F.3d 1104, 1106, 1107-08 (8th Cir. 2000) (rejecting claimant's argument that ratings of "seriously limited, but not precluded" by treating physician automatically served to disable claimant and holding that such a term is "both a measure of ability and disability," which requires review of whole record to determine "whether the balance tips toward functional ability or toward disability."); *Murray v. Colvin*, No. C-13-01182, 2014 WL 1396408, at *7 (N.D. Cal. Apr. 10, 2014) (adopting approach taken in *Cantrell*); *Notobartolo v. Astrue*, No. 06-2128, 2007 WL 4443245, at *4 (E.D. Pa. Dec. 18, 2007) (same). *But see Cruse v. United States Dep't of Health & Human Servs.*, 49 F.3d 614, 618 (10th Cir. 1995) (concluding that "seriously limited, but not precluded," is "essentially" same as "marked"), *superseded on other grounds by regulation as stated in Carpenter v. Astrue*, 537 F.3d 1264, 1268 (10th Cir. 2008)[7]; *Quinones v. Astrue*, 672 F. Supp. 2d 612, 621 (D. Del. 2009) (finding that "seriously limited but not precluded" is more consistent with definition of marked than definition of moderate). Even assuming, *arguendo*, that the two terms are synonymous, as explicated above, there is substantial evidence that supports the weight assigned to

---

[7] In *Murray v. Colvin*, No. C-13-01182, 2014 WL 1396408, at *7 (N.D. Cal. Apr. 10, 2014), the court recognized that "Cruse's definition, equating 'seriously limited but not precluded' to a 'marked' limitation has been widely criticized." *See also Esquivel v. Astrue*, No. 08-cv-01381-JLT, 2010 WL 367548, at *7 (E.D. Cal. Jan. 26, 2010) (recognizing same).

Dr. Stultz's opinion by the ALJ and the ALJ's conclusion at step three of the sequential evaluation process. As such, Claimant's contention that the ALJ should have found that she meets Listings 12.04 and 12.06 is unconvincing.

Therefore, the undersigned **FINDS** that the ALJ's determination that Claimant did not meet the paragraph B or paragraph C criteria for Listings 12.04 and 12.06 is supported by substantial evidence.

### C. The ALJ's Hypothetical Question to the Vocational Expert

Next, Claimant argues that the hypothetical questions posed to the vocational expert were incomplete because they failed to include the mental limitations found by Dr. Stultz.[8] (ECF No. 13 at 10). In order for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments. *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993); *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989). To frame a proper hypothetical question, the ALJ must first translate the claimant's physical and mental impairments into a RFC that is supported by the evidence; one which adequately reflects the limitations imposed by the claimant's impairments. *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006). "[I]t is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." *Fisher v. Barnhart,* 181 F. App'x 359, 364 (4th Cir. 2006). A hypothetical question will be "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." *Id.* (citing *Johnson v. Barnhart,* 434 F.3d 650, 659 (4th Cir. 2005)) (internal quotation marks

---

[8] In this section of her brief, Claimant also argues that the ALJ "desire[d] to ignore the law," and "had an agenda to deny the claimant." (ECF No. 13 at 10). There is nothing in the record to support these accusations. The ALJ conducted a fair and thorough hearing, and subsequently wrote a well-reasoned and extensive decision. There is no evidence that the ALJ had concocted any scheme to deny Claimant benefits or that the ALJ would receive any type of satisfaction or reward by doing so. Rather, it appears that Claimant has simply chosen to personally attack the ALJ because she received an unfavorable decision.

omitted); *see also Russell v. Barnhart*, 58 F. App'x 25, 30 (4th Cir. 2003) (noting that hypothetical question "need only reflect those impairments supported by the record"). However, "[t]he Commissioner can show that the claimant is not disabled only if the vocational expert's testimony that jobs exist in the national economy is in response to questions from the ALJ that accurately reflect the claimant's work-related abilities." *Morgan v. Barnhart*, 142 F. App'x 716, 720-21 (4th Cir. 2005).

At the administrative hearing, both the ALJ and Claimant's counsel posed a number of hypothetical questions to the vocational expert. (Tr. at 336-42). As relevant here, the ALJ asked the vocational expert whether there were jobs in the light work category that someone with Claimant's age, education, and past work experience could perform, except that the person could stand and walk for a total of about six hours of an eight-hour shift and sit for a total of about six hours of an eight-hour shift; could only climb ramps and stairs occasionally; could not climb ladders, ropes, or scaffolds; could only balance, stoop, kneel, crouch, or crawl occasionally; could not have concentrated exposure to extreme cold, extreme heat, fumes, odors, dusts, gases, and poor ventilation; must avoid even moderate exposure to hazards such as machinery and heights; could only have minimal contact with supervisors and co-workers; and could not perform work that involved calculating, problem solving, or reasoning. (Tr. at 336, 340). The vocational expert responded that an individual with those limitations could perform the jobs of inspector and grader/sorter at the sedentary exertional level as well as the jobs of hand packager and hotel maid at the light exertional level. (Tr. at 341). He further testified that there were 75,000 jobs nationally and 4000 jobs regionally for an inspector; 48,000 jobs nationally and 4500 jobs regionally for a grader/sorter; 276,000 jobs nationally and 16,000 jobs regionally for a hand packager; and 247,000 jobs

nationally and 14,000 jobs regionally for a hotel maid. (Tr. at 337, 341). Claimant's counsel then asked the vocational expert whether jobs existed for an individual with the physical limitations of the hypothetical, but who also had a poor ability to demonstrate reliability and a poor ability to behave in an emotionally stable manner. (Tr. at 342). The vocational expert replied that there would not be any jobs for such an individual. (*Id.*) The ALJ ultimately determined that Claimant's RFC matched the hypothetical that she supplied above, and thus, she relied on the vocational expert's testimony in determining at step five that Claimant had the capability to make "a successful adjustment to other work that exists in significant numbers in the national economy." (Tr. at 296, 302).

Claimant's argument again relates to Dr. Stultz's opinions. As discussed at length above, substantial evidence supports the ALJ's determination that Dr. Stultz's opinions were entitled to only "some weight." Moreover, substantial evidence supports the mental limitations contained in the ALJ's RFC determination, which reflect the ALJ's partial adoption of Dr. Stultz's opinions and thorough analysis of Claimant's mental health treatment records and the other opinion evidence. Additional opinions from Dr. Stultz as to further limitations, including Claimant's unreliability and emotional instability, were not supported by the medical evidence, and therefore, the ALJ was not required to adopt those limitations in crafting Claimant's RFC and posing her hypothetical question to the vocational expert. *See, e.g.*, *Russell*, 58 F. App'x at 30. Similarly, the ALJ was not required to adopt the additional mental limitations set forth in Claimant's counsel's hypothetical question as those limitations were not supported by medical evidence. *See, e.g.*, *France v. Apfel*, 87 F. Supp. 2d 484, 490 (D. Md. 2000) ("[B]ased on his or her evaluation of the evidence, an ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a claimant's counsel, even though these

considerations are more restrictive than those suggested by the ALJ.").

Accordingly, the undersigned **FINDS** that the ALJ's hypothetical question to the vocational expert was based on an RFC finding that included all of Claimant's mental impairments that were supported by the record.

### D. The ALJ's Decision to Refrain from Calling a Medical Expert at the Administrative Hearing

Finally, Claimant insists that the ALJ should have, at least, requested that a medical expert testify at the administrative hearing. By not calling a medical expert, Claimant argues that the ALJ placed herself in the position to act as a medical expert, which prejudiced Claimant because her counsel did not have the opportunity to cross-examine the ALJ as to her psychiatric conclusions. (ECF No. 13 at 3-4, 10).

"[I]t is within the administrative law judge's discretion whether to seek the assistance of a medical expert." *Boggs v. Astrue*, No. 2:12-CV-25, 2012 WL 5494566, at *7 (N.D.W. Va. Nov. 13, 2012) (citing Hearings, Appeals, and Litigation Law Manual (HALLEX) § 1-2-5-32); *see also* 20 C.F.R. §§ 404.1529(b), 416.929(b) ("At the administrative law judge hearing or Appeals Council level of the administrative review process, the adjudicator(s) **may** ask for and consider the opinion of a medical or psychological expert concerning whether your impairment(s) could reasonably be expected to produce your alleged symptoms.") (emphasis added); 20 C.F.R. §§ 404.1527(e)(2)(iii), 416.927(e)(2)(iii) ("Administrative law judges **may** also ask for and consider opinions from medical experts on the nature and severity of your impairment(s) and on whether your impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart.") (emphasis added); *Hiser v. Astrue*, No. 5:08-cv-00941, 2009 WL 3064374, at *19 (S.D.W.Va. Sept. 21, 2009) ("The decision

to call a medical expert at the administrative hearing is left to the discretion of the ALJ."); *Parker v. Astrue*, No. 6:07-cv-00472, 2008 WL 2405026, at *10 (S.D.W.Va. June 11, 2008) (recognizing same). On the subject of medical expert opinions at the ALJ level, SSR 96-6p states that an ALJ "must obtain an updated medical opinion from a medical expert" in two circumstances: (1) "When no additional medical evidence is received, but in the opinion of the administrative law judge ... the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable," or (2) "[w]hen additional medical evidence is received that in the opinion of the administrative law judge ... may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." 1996 WL 374180, at *3-*4.

In this case, the ALJ reviewed and analyzed the opinions of Dr. Allen and Dr. Boggess, who are both state agency medical consultants. (Tr. at 300). These opinions satisfied the requirement of SSR 96-6p that a medical expert's opinion be received by the ALJ on the issue of medical equivalence to any listed mental impairment.[9] 1996 WL 374180, at *3. Furthermore, the ALJ was only required to obtain an updated opinion from a medical expert if she believed that a judgment of medical equivalence may be reasonable or additional medical evidence was received that may have changed the opinions of Dr. Allen or Dr. Boggess. *Id.* at *3-*4. As pertinent here, the ALJ found in her decision that Claimant did not meet or medically equal Listings 12.04 and 12.06. (Tr. at 294-95). As explained above, the ALJ's decision in this respect is supported by substantial evidence. Moreover, there was no additional medical evidence that would

[9] Claimant seems to assert that any time a claimant alleges that he or she meets a listed impairment, the ALJ must call a medical expert at the administrative hearing. That contention is plainly meritless, and Claimant does not cite any authority to support such a proposition.

have changed the opinions of Dr. Allen and Dr. Boggess. Claimant's treatment records with Dr. Stultz for the period after Dr. Allen and Dr. Boggess formed their opinions were relatively unremarkable. In fact, the treatment records demonstrate that Claimant's panic attacks decreased at one point and that Claimant's conservative treatment plan improved her symptoms. Even if the additional treatment records can be viewed as equivocal, both Dr. Allen and Dr. Boggess opined that Claimant had no more than mild functional limitations, and as such, it is very unlikely that additional, equivocal treatment records would have substantially altered their opinions. (Tr. at 1022, 1057). Accordingly, under SSR 96-6p, the ALJ was not required to obtain an updated medical opinion from a state agency medical consultant.

Additionally, the ALJ also did not generally abuse her discretion in refraining from calling a medical expert at the administrative hearing. There was sufficient evidence in the record related to Claimant's mental health treatment and limitations for the ALJ to make a finding on that issue, including one treating physician's opinion, an evaluating psychologist's opinion, and two state agency medical consultants' opinions. The ALJ conducted a thorough inquiry into Claimant's allegations at the hearing and had more than enough medical and opinion evidence concerning Claimant's mental health in the record, which she extensively summarized and analyzed in her written decision. The mental health records and opinions were not confusing or difficult to understand. While conflicts may have existed in the records, the ALJ was required to resolve those conflicts in her written decision, and she did just that. *See Slaughter v. Barnhart*, 124 F. App'x 156, 157 (4th Cir. 2005) (recognizing that the ALJ has the duty to resolve conflicts in any evidence presented, not the courts). By doing so, the ALJ did not "stand[] in the shoes" of a medical expert, as Claimant alleges. (ECF No. 13 at 3).

42

Rather, the ALJ fulfilled her duties to consider all of the medical and opinion evidence, and address any conflicts that existed in the record. Nothing in the ALJ's written decision supports Claimant's contention that the ALJ offered medical opinions as to Claimant's mental health; rather, as the ALJ was required to do, she considered various opinions from acceptable medical sources and assessed their consistency with the record evidence. While Claimant insists that there was no medical evidence to support the ALJ's findings, her assertion ignores Ms. Perdue's evaluation and portions of Dr. Stultz's records.

For all of these reasons, the undersigned **FINDS** that the ALJ did not abuse her discretion by refraining from calling a medical expert at the administrative hearing.

## VIII.  **Recommendations for Disposition**

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 13), **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 14), **AFFIRM** the decision of the Commissioner, **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the

"Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  February 25, 2015

Cheryl A. Eifert
United States Magistrate Judge